MYERS v. UNITED STATES.

UNITED STATES v. MYERS.

(Circuit Court, N. D. New York. July 31, 1905.)

Nos. 23, 24.

1. CUSTOMS DUTIES—COUNTERVAILING DUTY—EXPORT DUTY—CANADIAN LICENSE FEE—WOOD PULP.

The action of the province of Quebec in imposing a license fee for cutting wood on public lands, which is reduced when the wood is manufactured into pulp in Canada, is in effect the imposition of an "export duty on pulp wood exported to the United States," within the meaning of Tariff Act July 24, 1897, c. 11, § 1, Schedule M, par. 393, 30 Stat. 187 [U. S. Comp. St. 1901, p. 1671], providing a countervailing duty on wood pulp equal to the amount of export duty imposed on pulp wood by the country of exportation.

2. SAME—WOOD PULP—PLACE OF MANUFACTURE.

Pulp produced in Canada from wood cut on public lands in Quebec is subject to the countervailing duty provided in Tariff Act July 24, 1897, c. 11, § 1, Schedule M, par. 393, 30 Stat. 187 [U. S. Comp. St. 1901, p. 1671], irrespective of whether it is manufactured into pulp in that province or not.

3. SAME—EXPORT DUTY—"COUNTRY OR DEPENDENCY"—PROVINCE OF QUEBEC.

The British North America Act (St. 30–31 Vict. c. 3, §§ 91, 92) gives the Dominion of Canada exclusive power to impose export and import duties, but distributes among the provinces of Canada certain leg-

islative powers, including that of taxation by way of license; and under this authority the province of Quebec imposes what is in point of fact and in effect an export duty. *Held*, that such duty is imposed by a "country or dependency," within the meaning of Tariff Act July 24, 1897, c. 11, § 1, Schedule M, par. 393, 30 Stat. 187 [U. S. Comp. St. 1901, p. 1671].

4. SAME—MIXED GOODS—CONSTRUCTIVE SEPARATION.

In regard to pulp imported from Canada, made from wood of which a part is subject to a Canadian export duty, *held*, that the countervailing duty equal to such export duty, which is imposed under Tariff Act July 24, 1897, c. 11, § 1, Schedule M, par. 393, 30 Stat. 187 [U. S. Comp. St. 1901, p. 1671], should be assessed on the basis of the percentage used therein of wood subject to the export duty, when such percentage is established by satisfactory evidence.

On Application for Review of a Decision of the Board of United States General Appraisers.

For decision below, see G. A. 5,592, T. D. 25,035, which sustained in part the contentions of F. W. Myers & Co. against the assessment of duty by the collector of customs at the port of Plattsburg.

The importers brought these proceedings for review of the decision so far as it was unfavorable to them, and the United States sought a review of the decision in the respects in which it sustained the importers' contentions. Some of the contentions passed on in said decision were disposed of on the authority of a former decision of the board. G. A. 5,306, T. D. 24,306. The following extracts, showing the grounds of the board's conclusions, are made from the opinions filed in the two decisions by Somerville, General Appraiser:

From G. A. 5,306:

"The importations covered by these two protests consist of wood pulp exported from the Dominion of Canada. The collector in each instance, in addition to the regular duty, assessed a countervailing duty at the rate of 25 cents for each cord of pulp wood used in the manufacture of this wood pulp. It appears without controversy that one cord of pulp wood will produce one ton of ground wood pulp, or about 1,400 pounds of chemical wood pulp or sulphite; and the assessment of the collector was evidently based on this estimate. This action was taken by him under instructions from the Treasury Department (T. D. 23,978) advising the assessment of this additional duty on all wood pulp imported from any part of the Dominion of Canada. This circular was based on the provisions of paragraph 393, Schedule M, § 1, of the Tariff Act of July 24, 1897 (30 Stat. 151, c. 11 [U. S. Comp. St. 1901, p. 1671]), which reads as follows:

" '393. Mechanically ground wood pulp, one-twelfth of one cent per pound, dry weight; chemical wood pulp, unbleached, one-sixth of one cent per pound, dry weight; bleached, one-fourth of one cent per pound, dry weight: provided, that if any country or dependency shall impose an export duty on pulp wood exported to the United States, the amount of such export duty shall be added, as an additional duty, to the duties herein imposed upon wood pulp, when imported from such country or dependency.'

"The merchandise covered by protest 54,235b, as shown by the testimony, was manufactured in the province of Quebec: * * * The regular duty imposed by said paragraph 393 was assessed upon the merchandise, the correctness of which action is not disputed, and also an additional or countervailing duty of 25 cents per cord on the pulp wood used in its manufacture. It is contended by the importers in each instance that this additional or countervailing duty was illegally assessed. * * * It appears from the testimony taken at the hearing that the province of Quebec owns certain lands, known as "crown lands," corresponding to what are called in this country "public lands." As shown by the record before us, the Revised Statutes of

this province (chapter 6, tit. 4), entitled "Department of Lands, Mines, and Fisheries and Matters Connected Therewith," in article 1250, read as follows: 'The term "public lands" shall be held to apply to lands heretofore designated or known as "crown lands" and "clergy lands," which designation, for the purposes of administration, shall still continue.' St. 32 Vict. c. 11, § 46. Article 1309 reads as follows: 'The commissioner of crown lands, or any officer or agent under him authorized to that effect, may grant licenses to cut timber on the ungranted lands of the crown at such rates and subject to such conditions, regulations, and restrictions as may, from time to time, be established by the lieutenant governor in council, and of which notice shall be given in the Quebec Official Gazette.' C. S. C. c. 23, § 1. Under the authority conferred on him by this law, the lieutenant governor in council adopted the following regulation, entitled 'Stumpage Tariff': '(15) All wood goods cut in virtue of a license are subject to the following charges: * * * Pulp wood per cord of 128 cubic feet * * * 65 cents, with a reduction of 25 cents per cord on timber manufactured into paper pulp in the Dominion of Canada.' Article 1315 of the same chapter provides that 'every person obtaining a license shall, at the expiration thereof, make to the officer or agent granting the same, or to the commissioner, a return of the number and kinds of trees cut, and of the quantity and description of saw logs, or of the number and description of sticks of square timber manufactured and carried away under such license.' C. S. O. c. 23, § 3. * * *

"So far as concerns all the exportations from Quebec, it is evident that pulp wood which is to be manufactured in Canada pays to the government a tax of 40 cents a cord, and pulp wood which is to be manufactured outside of Canada after exportation pays a tax of 65 cents a cord. It is contended by the counsel for the government that the plain effect of this provision is that the sum of 25 cents a cord is levied on pulp wood exported to the United States, and is not levied on pulp wood manufactured or consumed in Canada, and that the real question presented by these protests is narrowed down to whether the additional license fee or tax, levied by the province of Quebec upon pulp wood exported to the United States and not levied upon pulp wood manufactured in Canada, is in fact an export duty, within the meaning of said paragraph 393. We find in the report of the commissioner of lands, forests, and fisheries for the province of Quebec for 1901 the following allusion to this subject: 'I will refer in the first place to article 15 of the revised regulations, as sanctioned by order in council dated the 1st of June, 1901, and especially to that portion of the third paragraph of the tariff which applies to the differential stumpage dues imposed on wood intended to be manufactured into pulp abroad and which is shipped out of the country in the shape of logs. This clause must be interpreted as follows: All pulp wood 128 cubic feet to the cord, equivalent to 600 feet board measure, is charged with 65 cents per cord, equal to $1.08 per 1,000 feet, or an additional charge of 43 cents. These protective duties in favor of that section of our Canadian manufactures replace those imposed by the order in council dated the 18th of January, 1900, because the latter were found in many instances excessive.' An export duty is a duty or tax imposed upon merchandise on its exportation from any country, and this is necessarily true, in whatever form or disguise this tax may be concealed. As said by Mr. Justice Miller, in Henderson v. Mayor, 92 U. S. 259, 268, 23 L. Ed. 543, 'in whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect.' And this principle has recently been reaffirmed by Mr. Justice Peckham, in Collins v. State of New Hampshire, 171 U. S. 30, 18 Sup. Ct. 769, 43 L. Ed. 60, who cited the Henderson Case with approval, remarking that 'the direct and reasonable result of a statute must be taken into consideration when deciding as to its validity, even if that result is not in so many words either enacted or distinctly provided for.' In other words, in construing statutes the courts look beyond mere form and consider the substance, in arriving at the true character and intent of the lawmaking power. 'The substance and not the shadow, determines the validity of the exercise of the power.' Postal Telegraph Cable Company v. Adams, 155 U. S. 688, 698, 15 Sup. Ct. 268, 270, 39 L. Ed. 311. And the same observation may be made in reference to the nature

and probable effect of the exercise of the power of taxation. This principle is fully discussed and applied by the Supreme Court of the United States in the case of Fairbank v. U. S., 181 U. S. 283, 21 Sup. Ct. 648, 45 L. Ed. 862, and especially so far as it bears upon the subject of export duties. It was there held that a stamp tax imposed on a foreign bill of lading by Congress was in substance and effect, equivalent to a tax on the articles included in that bill of lading, and therefore a tax or duty on exports prohibited by the United States Constitution (article 1, § 9); the court observing that 'no legislation can be tolerated which, although it may not conflict with the letter, destroys the spirit and purpose of the restriction imposed.'

"That a license exacted from a person may in legal effect operate as, and be construed to be, either an impost or export duty, has many times been decided, and is considered as settled law since the decision of the Supreme Court in the case of Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678, where it was held, Chief Justice Marshall delivering the opinion of the court, that a license exacted by the state of Maryland from all importers of foreign goods and others selling the same by wholesale, although in form a tax upon the person or his occupation, was in legal effect a tax on imports, and for this reason in violation of the federal Constitution (article 1, § 10), which prohibits any state, without the consent of Congress, from laying any duty on imports or exports, except such as may be absolutely necessary for executing its inspection laws. So, in Robbins v. Shelby County Taxing District, 120 U. S. 489, 7 Sup. Ct. 592, 30 L. Ed. 694, it was held that a license required by the state of Tennessee upon drummers and other persons offering for sale or selling merchandise by sample was a restriction upon interstate commerce, which was beyond the power of the state to regulate. The Supreme Court of Alabama, in Joseph v. Randolph, 71 Ala. 499, 46 Am. Rep. 347, in like manner held a law unconstitutional which provided that no person should be permitted to 'employ, engage, contract, or in any other way induce laborers to leave the state,' without first paying a license of $250. Applying the principle that the purpose of this license must be determined by its natural and reasonable effect, it was construed to be an indirect tax upon the citizen's right of free egress from the state, operating to hinder the exercise of his personal liberty and to seriously impair his right to migrate, and for this reason was violative of both the state and federal Constitutions. Note, also, as bearing on this subject, Emert v. Missouri, 156 U. S. 296, 15 Sup. Ct. 367, 39 L. Ed. 430, and numerous cases cited in the opinion of the majority of the court in Fairbank v. U. S., 181 U. S. 283, 21 Sup. Ct. 648, 45 L. Ed. 862, the review of which would make this opinion unnecessarily elaborate. It is sufficient to say that in our judgment, applying the vital principle settled in these cases, the legislation of the province of Quebec and the regulations carrying it into effect, which provide for a license of 40 cents a cord on pulp wood not exported, and of 65 cents a cord on pulp wood that is exported, operate to impose an additional charge of 25 cents upon all pulp wood which is exported from that province.

"It is argued by the counsel for the importers that the Dominion Parliament of Canada only is invested with the power to levy export duties under the act of organization known as the British North America Act of 1867, subsection 3 of section 91, conferring on them the power to 'raise money by any mode or system of taxation'; whereas the taxing power of the provincial legislatures, including that of Quebec, is confined to direct taxation within the province, 'in order to the raising of revenue for provincial purposes.' In our opinion, the discussion of this question is unnecessary and immaterial. The conflict of powers between the Dominion Parliament and the Legislature of the province, if any exists, is exclusively of domestic polity. The only phase of the question which we can properly consider is one of fact, that this export duty is actually imposed by the province, apparently without any interference on the part of the Dominion Parliament or the courts. The only question for this board to consider is the proper interpretation of the proviso to paragraph 393 of the tariff act of 1897, which is the law of this country and not of Canada. The case of Downs v. U. S., 187 U. S. 496, 23 Sup. Ct. 222, 47 L. Ed. 275, affirming board decision in Re Downs, G. A. 4,912, T. D. 22,984, involved the interpretation of section 5 of the

present tariff act of July 24, 1897 (30 Stat. 205, c. 11 [U. S. Comp. St. 1901, p. 1693]), which provided for an additional duty on any article imported into this country, and coming from any country, dependency, or colony which bestowed, directly or indirectly, any bounty or grant upon the exportation of such article from such country, dependency or colony; this additional duty being fixed at the amount of such bounty or grant. The court held that the remission of an excise tax imposed by Russia upon the exportation of sugar from that country, effected by certain ingenious regulations manifestly designed to disguise its true character, operated as, and in legal effect was, a bounty bestowed upon exportations of this character, notwithstanding the fact that the Russian government protested that under its own construction of the laws no such bounty was intended or was in fact paid by it. This was held to be true, 'by whatever process, or in whatever manner, or under whatever name it was disguised.' The nature of the bounty was construed in the light of our own domestic legislation, and not in that of its Russian interpreters. * * *

"Under the foregoing views of the law and the facts we hold as follows: First, that the additional duty was properly imposed by the collector upon the wood pulp exported from Quebec. * * *"

## From G. A. 5,592:

"The wood pulp covered by some of these protests was manufactured in part from pulp wood cut from crown lands in the province of Quebec, and in part from pulp wood cut from private lands; the product of the manufactures being indiscriminately mixed. In one or more cases hereinafter designated the pulp wood was all cut from private lands. The contention was made at the hearing, and is also urged in the briefs of counsel for the importers, among other things, that, if any one of these importations is liable at all to a countervailing duty, this duty can be assessed only upon such fractional portions of the wood pulp as were manufactured from pulp wood cut on crown lands in Quebec. It is made to appear by satisfactory evidence that all of the wood from which the wood pulp in each of these cases was made was cut in the province of Quebec, but that two of the importations under consideration cover pulp wood manufactured in the province of Ontario. It has been held by this board (In re Myers, G. A. 5,306, T. D. 24,306) that the laws and regulations of the province of Quebec, Canada, in legal effect levy an export duty on wood pulp of 25 cents per cord only in cases where such pulp is made from pulp wood taken from crown lands, but that no duty whatever was levied on such pulp wood by the laws and regulations of the province of Ontario. No appeal was taken from this decision of the board, but its correctness is now assailed. It is now insisted that, while the Dominion of Canada may be a 'country or dependency' of Great Britain, yet the provinces of Ontario and Quebec cannot be construed to fall within that designation. In our judgment this position is untenable. In Stairs v. Peaslee, 18 How. 521, 15 L. Ed. 474, a similar phrase was construed to embrace all the possessions of a foreign state, however widely separated, which are subject to the same supreme legislative and executive control. In that case the importation under consideration was made directly from Halifax into the United States, and the local appraiser adopted as a basis of valuation the market value of the same class of goods at London and Liverpool, which were the principal markets in England. This was held to be a lawful mode of appraisement. This ruling was followed by the board in Re Jackson, G. A. 1,007, T. D. 12,145, decided November 12, 1891, where it was held that the act of the British Parliament, known as the 'British North America Act of 1867,' which is the organic law, and which conferred on the Dominion of Canada a certain degree of political autonomy, justified no departure from the rule laid down by the Supreme Court in the case of Stairs v. Peaslee. The following language was used by the board: 'The executive government and authority of and over Canada continues, however, to be vested in the Queen of Great Britain, and Canada remains an integral part of that country, not, however, altogether sovereign or independent in its legislative and judicial relations to the mother country. The legislation runs in the name

of "Her Majesty the Queen, by the advice and consent of the Senate and House of Commons," and appeals lie in some instances from the decisions of the Canadian courts to the Privy Council.'

"We concur, however, in the further contention made by the importers that this countervailing duty should be assessed only upon the fractional portion of the wood pulp which is made from pulp wood liable to export duty, and not upon the other part made from pulp wood not liable to such export duty, provided that satisfactory evidence be produced which will enable the board to ascertain such dutiable and nondutiable portions of each importation. Any other construction of said paragraph 393 would not seem to be in harmony with the intent of Congress or the manifest purpose for which the statute was enacted. The very letter of the proviso limits the countervailing or additional duty which is to be assessed upon the arrival of the importation in this country to the amount of such export duty,' meaning such export duty as had been imposed on the pulp wood, and no more nor less. This duty being purely compensatory, its assessment would answer every purpose for which the statute was enacted. In the case of U. S. v. Ranlett, 172 U. S. 133, 19 Sup. Ct. 114, 43 L. Ed. 393, the importation involved a number of bags, a portion of which were foreign-made bags, and therefore liable to duty as such, while another portion consisted of bags of American origin, which were made free of duty under certain conditions stated in the tariff. These goods were indiscriminately mixed, and no proof was made as to the particular quantity of each kind, the dutiable and nondutiable. The examiner of the merchandise testified that he found in such bales as he had examined 'about 80 to 86 per cent.' of foreign made, 'in general from 75 to 80 per cent.,' and that in his judgment there was no invoice that showed over 25 per cent. of American bags. Upon the basis of this approximate estimate the Supreme Court reversed the judgment of the lower court and ordered a reliquidation of the entry, so as to allow the importer a refund of 25 per cent. of the duties paid on the entire importation of about 3,000 bales of bags. We think it is sufficient in cases of this kind, where the goods are indiscriminately mixed without fraud on the importers' part, if the pro rata quantity of dutiable and nondutiable goods embraced in each importation is shown by competent and satisfactory evidence, or, in other words, as stated by Mr. Greenleaf, if there is 'sufficient probability' of the truth of the contention made by the importer. 1 Greenleaf, Ev. [15th Ed.] § 1. As said in New York Accident Insurance Co. v. Clayton, 59 Fed. 559, 8 C. C. A. 213: 'A preponderance of the evidence is sufficient. This is so well settled by the authorities in this country that it does not permit discussion.'

"Applying the principle of the Ranlett Case, which has been uniformly followed by this board in various decisions, we are of opinion that upon the whole evidence it satisfactorily appears that in each of these importations the fractional parts of the wood pulp, both dutiable and nondutiable, are correctly stated in the schedule enumerating each of the protests under consideration. We think it immaterial that in one or two of these cases the wood pulp was manufactured in the province of Ontario and was imported from that province into the United States, inasmuch as a part of the assessable portion of this merchandise was made from pulp wood taken from public lands in Quebec; the latter province, as we have stated, imposing a duty upon pulp woods of this character. Any other conclusion would lead to a construction that would defeat the intent of the statute. * * *"

Taylor L. Arms, Asst. U. S. Atty.

Henry J. Cookinham, for the importers.

RAY, District Judge. This appeal relates to protests 58,943b, 59,-372b, 59,489b, 58,164b, 58,162b, 58,160b, and 59,940b, countervailing duty on wood pulp. Tariff Act July 24, 1897, c. 11, § 1, Schedule M. par. 393, 30 Stat. 187 [U. S. Comp. St. 1901, p. 1671], reads as follows:

"Mechanically ground wood pulp, one-twelfth of one cent per pound, dry weight; chemical wood pulp, unbleached, one-sixth of one cent per pound, dry weight; bleached, one-fourth of one cent per pound, dry weight; Provided, that if any country or dependency shall impose an export duty on pulp wood exported to the United States, the amount of such export duty shall be added, as an additional duty, to the duties herein imposed upon wood pulp, when imported from such country or dependency."

The wood pulp in question came from Canada as an importation into the United States. The board held that pulp manufactured in Ontario from wood cut from public lands in Quebec was subject to the countervailing duty; that pulp made from wood cut from public lands in Quebec and manufactured in Quebec was subject to the countervailing duty; that pulp manufactured from wood cut from private lands and manufactured either in Quebec or Ontario was not subject to the countervailing duty; and that as the pulp could not be segregated, but the proportion could be established by a percentage, the entire importation was not subject to the duty, but only that percentage of pulp which was made from wood taken from public lands.

The importers contend: First, that the government has no right to impose a countervailing duty upon pulp imported from any part of the Dominion of Canada; second, that in any event the countervailing duty cannot be imposed upon pulp manufactured in Ontario from wood cut on public lands in the province of Quebec; third, that in no event is the countervailing duty leviable on pulp imported from Quebec, except as to the extent that it is made from wood cut on public lands and upon which there has been a reduction of the stumpage dues.

The Dominion of Canada is divided into provinces, among which are Ontario and Quebec. By the British North America Act (chapter 3, 30–31 Vict.), the Dominion of Canada has exclusive power to impose export or import duties. But in sections 91 and 92 of that act we find, in the distribution of powers among the provinces, that it is provided each provincial legislature has the following power of legislation: (1) Power of direct taxation within the province, in order to the raising of revenue for provincial purposes; (2) management and sale of public lands belonging to the province, and of the timber and wood thereon; (3) shop, saloon, tavern, auctioneer, and other licenses, in order to the raising of the revenue for provincial, local, or municipal purposes. I think each province has the power of taxation by way of license in those matters confided to it. If, in the exercise of this power lawfully granted, whether by the mother country direct or by it through the Dominion, the province in point of fact and in effect imposes an export duty on pulp wood exported to the United States, it is an imposition of that duty by the Dominion of Canada. There is no question that the Dominion of Canada is a dependency of the Kingdom of Great Britain. I do not regard it necessary to recite the various laws, etc., bearing on the subject. In effect, by authority of law, an export duty is imposed. It is not done directly by the Kingdom of Great Britain, or directly by the Dominion of Canada, but it is done under legislation authorized by the Dominion. I cannot agree with the reasoning that arrives at a conclusion that this is not a duty imposed by a dependency of the country we call England, one of the great powers of the world. It is not called an export duty by that Dominion, but

is imposed as a license fee. The merchandise cannot escape our law, because we call it export duty and Quebec or Ontario calls it a license. The question is, What is it in effect and in fact?

The government has appealed, and contends that, inasmuch as dutiable merchandise was mixed with nondutiable goods of the same kind or same general description, the whole must pay duty, and that the duty should not be assessed on the basis of the percentage of dutiable pulp wood in the mixture. Had the two, that dutiable and that nondutiable, been mixed for the purpose of evading the payment of duty, or so mixed that it was impossible or exceedingly difficult to ascertain or determine the amount or percentage of dutiable merchandise, a different question would be presented. It is unnecessary to decide that question now. In this case the percentage of dutiable goods is easily determined, and by assessing the duty on that percentage the government is fully protected. The proper amount of duty is capable of being ascertained by satisfactory evidence, and no fraud was attempted.

The decision of the Board of General Appraisers is affirmed.